OPINION OF THE COURT
Marcy S. Friedman, J.
This is a residential summary nonpayment eviction proceeding in which respondent seeks to vacate two stipulations of settlement that she signed without benefit of counsel. The later stipulation, dated November 21, 1991, provided for respondent to pay eight months’ rent at the rate of $588 per month. This stipulation left in place a default judgment and *302 warrant of eviction based on respondent’s noncompliance with an earlier stipulation, dated May 29, 1991, which also required payment of rent at the $588 rate.
Having now obtained counsel through the Legal Aid Society, respondent argues that the stipulations should be vacated because respondent lacked basic knowledge of her legal rights and, in particular, did not know at the time of signing the stipulations that they called for payment of rent in a monthly amount over two times greater than the legal regulated rent for her rent-stabilized apartment.
Respondent makes a compelling factual showing of this rent overcharge. Petitioner does not dispute the showing and instead argues that the stipulations should not be vacated because respondent had the opportunity to obtain counsel, chose to proceed pro se, and is accordingly now barred from obtaining any relief from the stipulations, whatever their terms.
This argument is based on a misunderstanding of the standards applicable to vacatur of stipulations. While a stipulation is essentially a contract and should not be lightly set aside (Hallock v State of New York, 64 NY2d 224 [1984]), relief from a stipulation may be granted in order to prevent injustice, upon a showing of good cause. (Matter of Frutiger, 29 NY2d 143 [1971]; Cabbad v Melendez, 81 AD2d 626 [2d Dept 1981].) Collusion, mistake, accident and fraud are often cited as examples of good cause. However, " 'the discretion of a court is not that closely confined. The court should act if it appears that the stipulation is unduly harsh or unjust and the parties may be returned to their former status.’ ” (Amsterdam Co. v Levy, NYLJ, Mar. 9, 1987, at 14, col 3 [App Term, 1st Dept] [quoting Solack Estates v Goodman, 102 Misc 2d 504, 506, affd 78 AD2d 512 (1st Dept 1980)].) As further explained in Cabbad: "Good cause is demonstrated where it appears that a party has 'inadvertently, unadvisably or improvidently entered into an agreement which will take the case out of the due and ordinary course of proceeding in the action, and works to his prejudice.’ ” (81 AD2d 626, supra.)
A party’s lack of representation at the time of entry into the stipulation is a significant factor to be considered in determining whether good cause exists to vacate the stipulation. (See, e.g., Cabbad v Melendez, supra, at 626; Arthur Mgt. Co. v Ortiz, NYLJ, Jan. 9, 1986, at 14, col 2 [App Term, 2d & 11th Jud Dists]; City of New York v Hicks, NYLJ, Feb. 3, 1992, *303 at 24, col 4 [App Term, 1st Dept]; GTS Holding Corp. v Cruz, NYLJ, June 25, 1987, at 12, col 6 [App Term, 1st Dept]; Amsterdam Co. v Levy, supra; 1504 Mgt. Co. v Liddie, NYLJ, Apr. 28, 1986, at 7, col 2 [App Term, 1st Dept]; see also, Lewis v Garber, NYLJ, Feb. 19, 1992, at 21, col 2 [App Term, 1st Dept].) While lack of representation is not sufficient to invalidate a stipulation, good cause for vacatur exists where the lack of representation has resulted in a stipulation whose terms are unduly one-sided or unfair.
Unfairness will be found where a pro se tenant has failed to assert a substantial defense to the landlord’s claims in the proceeding. For example, stipulations have frequently been set aside by the appellate courts where the tenant agreed to vacate a rent-regulated apartment, notwithstanding the existence of possible defenses to the proceeding. (GTS Holding Corp. v Cruz, supra [tenant was unaware of statutory right to cure the complained of condition and preserve the stabilized tenancy]; Amsterdam Co. v Levy, supra [tenant had factual defenses to landlord’s nuisance claim]; 1504 Mgt. Co. v Liddie, supra [tenant who agreed to vacate in context of nonpayment proceeding had possible jurisdictional and habitability defenses].)
But the standard of fairness is not so narrow. A stipulation will be vacated, even in the absence of so extreme a provision as a forfeiture of the tenancy, where the landlord has not complied with the predicates for maintenance of an eviction proceeding, or the tenant’s nonassertion of a defense has resulted in substantial prejudice. Thus, in Caceres v Golden (App Term, 2d & 11th Jud Dists, Mar. 7, 1991, index No. 90-502K), this Department recently held that a motion to vacate a pro se stipulation should have been granted based on the tenant’s showing that the landlord had failed to allege the rent regulatory status of the premises in the petition and had also failed to register the premises with the appropriate rent regulatory agency. In Arthur Mgt. Co. v Ortiz (NYLJ, Jan. 9, 1986, at 14, col 2, supra), this Department’s Appellate Term held that the stipulation should have been vacated by the lower court "since the tenant entered into same without the benefit of counsel, the stipulation provided for a rental well in excess of the amount that the landlord was entitled to by law and the landlord itself did not comply with the terms thereof.” The court noted that vacatur was warranted on the further ground that the landlord had not obtained required authorization from the Housing Authority before instituting the pro *304 ceeding. Similarly, in Spradkley v Edwards (NYLJ, Jan. 28, 1987, at 40, col 6), the Appellate Term vacated a stipulation because it required payment of rent that had already been paid.
In the present case, respondent has made an undisputed showing that the stipulation required payment of rent "well in excess” of the legal amount. This case provides a textbook example of a one-sided stipulation unadvisedly signed by a pro se litigant who lacked knowledge of a defense which would have substantially defeated petitioner’s claims.
In recent years, the plight of unrepresented tenants like respondent has become the subject of increasing concern and consideration by the Chief Administrators of the Courts and distinguished committees of the Bar. Studies have shown that landlords are represented in approximately 80% to 90% of summary eviction proceedings, while tenants are unrepresented in all but 10% to 15% of such proceedings; that the overwhelming majority of unrepresented tenants are poor persons, most of whom are members of racial and ethnic minorities; and that this inequality in access to representation results in eviction in a significant number of cases. A 1986 study found, for example, that over 25% of the City’s shelter population cite eviction as the cause of their homelessness. (See, Rubin, New York City’s Housing Court, 12 NY St Bar Assn 3, Newsletter, Gen Practice Section [1991] [summary of the various studies].)
More particularly, the Committee to Improve the Availability of Legal Services, commonly known as the Marrero Commission, recently completed a study (Final Report to the Chief Judge of the St of NY [Apr. 1990] [unpublished manuscript]), which found that "[t]he overwhelming majority of the evictions ordered in Housing Court involve unrepresented tenants” and that "[t]he mere presence of counsel for the tenants shifts the balance in the Housing Court and significantly enhances poor litigants’ chances of * * * avoiding homelessness.” (Id., at 17.)
The Marrero Commission, which was convened by Chief Judge Sol Wachtler to consider the extent of the unmet need for civil legal services among the poor in New York State and to recommend ways to improve the availability of those services, concluded that a mandatory pro bona obligation should be imposed on all members of the Bar. In reaching this conclusion, the Commission explained:
*305 "In short, whether one resorts to the evidence of everyday experience, the demographic statistics of the State, in-depth studies of particular areas like the Housing Court or a comprehensive survey of legal needs such as the New York State Bar Association report and similar studies across the country, a single conclusion is inescapable: our society has evolved so that the poor need legal help to obtain basic human requirements and to an appalling degree cannot get it.
"This failure takes an intolerable toll not only on the poor but on the public as a whole. The absence of effective legal counsel and the consequent denial of access to resources made available by law impose significant social and economic costs. Deny a poor family counsel in an eviction proceeding and it greatly increases the likelihood that the family will become homeless * * *
"Moreover, the imbalance between the need for legal services and their availability undermines the legitimacy of the legal system itself. It is grotesque to have a system in which the law guarantees to the poor that their basic human needs will be met but which provides individuals no realistic means with which to enforce that right. The absence of legal assistance to the poor goes to the essence of some fundamental principles ingrained in our jurisprudence: simple equity, due process, equal protection, equal elementary access to the judicial system to redress wrongs.” (Id., at 18-19.)
The report went on to cite Judge Wachtler’s observation, when he delivered his charge to the Commission, that "a justice system which allows vast disparities in access to justice based on ability to pay cannot truly be called a system of justice at all.” (Id., at 20.)
The Marrero Commission substantially confirmed the findings of a more detailed study by the Committee on Legal Assistance of the Association of the Bar of the City of New York (Housing Court Pro Bono Project, parts I, II [June, Nov. 1988] [unpublished manuscript]) with regard to the need for counsel in Housing Court. This study concluded that the inequality in representation deprives tenants of their legal rights (id., part II, at 36-51), and that the "provision of counsel to persons facing eviction constitutes the single indispensable reform required in the Housing Court. ” (Id., part I, at 36.)
The study grew out of the year-long participation of five of the City’s largest firms with legal services offices in a project to provide pro bona representation to indigent tenants in *306 Housing Court. The Committee’s conclusion as to the necessity for representation was based not only on the self-evident proposition that a represented party has vastly greater access to information about legal rights, but also on direct experience in Housing Court practice.
The Committee observed that the tremendous volume of cases leads to a "jurisprudence of ultimate expedition”. (Id., part II, at 20.) As nearly 400,000 eviction cases are filed per year (based on statistics for 1985), each Housing Judge handles over 12,000 cases per year (compared to 263 cases with notes of issue for each Supreme Court Justice in the New York City counties), or an average of over 33 Vs cases per day. (Id., part II, at 19-22.) These cases are disposed of at an average rate of five to 14 minutes per case, with many settlements in the range of five minutes or less. (Id., part II, at 21-23.) Thus, most cases are settled with only minimal supervision by the court. Yet, housing laws and regulations are so complex — in the words of the Court of Appeals, an " 'impenetrable thicket, confusing not only to laymen but to lawyers’ ” (id., part II, at 39, quoting Matter of 89 Christopher v Joy, 35 NY2d 213, 220) — that "it is unreasonable and unfair to assume that unrepresented parties are able to understand the legal possibilities that exist at any stage of a proceeding.” (Id., part II, at 12-13.)
The facts of the present case illustrate the truth of these findings. On the date of the final settlement of the case, this court had 36 cases on its calendar. The settlement was made between the parties in the hallways of the courthouse and was brought into the court for "so ordering”. At the time, only petitioner had counsel. The court’s "allocution” (or review of the stipulation) lasted approximately six minutes and was devoted chiefly to questioning respondent about how she would make the payments due under the stipulation and to ascertaining whether respondent understood the stipulation as written and the consequences of default. The allocution was not designed to elicit whether respondent had an overcharge defense to petitioner’s rent claims. Nor could it have done so, as an overcharge defense is based on complex legal and factual issues, and respondent had no knowledge of the facts supporting her defense until she subsequently obtained counsel.
Moreover, at the time of the allocution, respondent not only lacked knowledge of her defenses but was apparently also unaware even of the possible usefulness of legal representa *307 tian. The record is devoid of any evidence that respondent made an informed or knowing choice to proceed without counsel. Quite the opposite appears from the record of the allocution and the factual showing made in respondent’s motion papers as to the circumstances under which respondent attempted to defend this proceeding pro se. Respondent is indigent and initially settled this proceeding based on the expectation that the Department of Social Services (DSS) would pay her rent arrears. She was unsuccessful in obtaining assistance, and failed to pay the arrears due under the first stipulation. She then defaulted on petitioner’s motion for judgment under the stipulation, apparently on the advice of a public assistance caseworker that DSS would not pay and that she had no choice but to move. After receiving a marshal’s 72-hour notice of eviction, she obtained an order to show cause to stay the eviction, and proceeded to enter into the final stipulation, based on another effort to obtain the assistance from DSS which had thus far eluded her. It was not until the allocution of that stipulation, when the court pointed out that she might qualify for special benefits to stop the eviction under the Jiggetts case (Jiggetts v Grinker, 75 NY2d 411) and that she needed to see a lawyer to find out whether this was so, that she finally appreciated the need for legal representation.
Respondent’s case is not atypical. The vast majority of cases in Kings County are nonpayment proceedings settled by stipulations to pay out the rent arrears. Based on allocutions of approximately 5,000 such cases in the past year, this court’s conclusion is that the stipulations are generally signed without knowledge of possible defenses and out of fear of eviction or the sense that there is no alternative. The overwhelming majority of unrepresented tenants lack even basic understanding about their legal rights and the defenses which they may have to the petitioners’ claims for rent. Most have repair problems but do not know that housing code violations may affect their landlords’ entitlement to rent. Many are unaware that they may even seek repairs if they are behind in their rent. Few tenants have any idea whether their rents are legal. Virtually none understand the differing legal consequences of the various enforcement remedies for which the stipulations provide (for example, the difference between an installment agreement with a provision for entry of judgment upon default, and a judgment with issuance of a warrant of eviction forthwith and stay of execution provided payments are made). Many do not seem to be aware that the stipulations are *308 supposed to be the result of negotiations, and that they are not required to sign the stipulations as drafted by the landlords’ attorneys. Most tenants do sign whatever is presented to them, frequently without reading it or having it read to them first, and often even when they are not sure whether they owe or dispute the amount the landlord claims is due. Startlingly, many tenants appear to be unaware not only of what their defenses are but of the fact that they may have defenses. Perhaps for this reason, tenants frequently do not see the need to seek counsel even when given the opportunity to do so.
The critical problems caused by lack of representation for tenants in Housing Court can only be addressed from a number of perspectives. Greater availability of counsel is the obvious but crucial long-term solution. In the short-term, the Housing Court itself needs to develop procedures which will better ensure that the claims of unrepresented tenants are asserted and considered. (See generally, Housing Court Pro Bono Project, part II, op. cit. [recommendations].) The Bar also must further consider its ethical responsibilities in dealing with pro se litigants.
Most important for present purposes, when it is called to the court’s attention that the lack of representation has resulted under the circumstances of the particular case in an inequitable stipulation, the court cannot permit itself the illusion, comforting though it might be but which our own Chief Administrators have rejected, that settlements in Housing Court are generally the result of arm’s length transactions between parties of equal bargaining power.
The appellate cases which set forth the standards for vacatur of stipulations signed by pro se tenants have not explicitly examined the circumstances under which Housing Court cases are settled. However, they have uniformly recognized the significance of lack of representation as a factor supporting vacatur. Thus, while these cases do not expressly articulate the reality of Housing Court practice, they provide a remedy for it in circumstances where, as in the present case, the lack of representation has resulted in loss of substantial claims and the parties can be restored to their former status.
It is accordingly ordered that the stipulations in the present *309 case are vacated. As the default judgment was based on a stipulation which has been vacated, the judgment is vacated as well. Respondent is granted leave to serve and file an amended answer by April 16, 1992, and the proceeding is restored to the calendar of this Part on April 27,1992.