Rossmill Assoc., LP v Watanabe (2024 NY Slip Op 24048)

[*1]

Rossmill Assoc., LP v Watanabe

2024 NY Slip Op 24048

Decided on February 21, 2024

Civil Court Of The City Of New York, New York County

Bacdayan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on February 21, 2024
Civil Court of the City of New York, New York County

Rossmill Associates, LP, Petitioner,

against
Watanabe Masuyaki Watanabe, Respondent.

Index No. LT-318787-22/NY

Belkin Burden Goldman, LLP (Scott Loffredo, Esq.), for the petitioner
Housing Conversation Coordinators (Lynn Horowitz, Esq.), for the respondent

Karen May Bacdayan, J.

Recitation, as required by CPLR 2219 (a), of the papers considered in review of this motion by NYSCEF Doc No: 13-37.
After oral argument and upon the foregoing cited papers, the decision and order on this motion is as follows:
PROCEDURAL HISTORY AND FACTS
This is a summary eviction proceeding commenced in New York County Housing Court against Watanabe Masayuki Watanabe ("respondent" or "Masayuki Watanabe") on the basis of nonpayment of rent. Respondent filed an answer with the court clerk, pro se, on December 15, 2022, and received the first court appearance date: December 22, 2022. Respondent's answer asserted the following: "The monthly rent asked for is not the legal rent or amount on the current lease[,] [and] the rent, or part of the rent, has already been paid to [petitioner]." Respondent also indicated that he had applied for the Emergency Rental Assistance Program ("ERAP").[FN1]
 Respondent appeared in court on December 22, 2022, and accepted the opportunity — presented to each unrepresented respondent on their first court date  to meet with the Universal Access to Counsel ("UAC") provider of the day, the New York Legal Assistance Group ("NYLAG"). Respondent received advice from a NYLAG attorney to assert additional defenses and counterclaims. (NYSCEF Doc No. 15, Watanabe affidavit ¶ 8.) After meeting with NYLAG, respondent interposed another substantively enhanced answer, filed on NYSCEF, asserting, inter alia, a personal jurisdiction defense, payment of some or all of the claimed arrears, unlawful [*2]overcharge, illegal deregulation, breach of the warranty of habitability, and laches. (NYSCEF Doc No. 5, pro se answer, dated December 22, 2022.)[FN2]
The proceeding was adjourned two and a half months for all purposes to March 13, 2023, to enable respondent to connect with NYLAG or seek counsel on his own. On March 13, 2023, petitioner appeared in court without a rent breakdown as required by the Part Rules.[FN3]
Accordingly, the proceeding was adjourned again to May 15, 2023, a date five months after respondent filed what is in effect an amended answer, interposed with the benefit of advice provided by the UAC provider of the day. NYLAG did not accept respondent's case for full representation.
On May 15, 2023, respondent entered into a stipulation and consented to a final judgment of possession in the amount of $21,506.20. (NYSCEF Doc No. 7, stipulation dated May 15, 2023.) The stipulation provided that he would pay $21,506.20 by July 31, 2023, and as long as he paid his monthly rent for June 2023 by June 5, 2023 and for July 2023 by July 5, 2023, the landlord would not cause service of a marshal's notice of eviction. (Id. ¶ 5.) Concomitant with the execution of the stipulation, the parties entered into a lease extension, attached as Exhibit A to the agreement. The parties agreed the lease extension would retroactively commence on October 1, 2020, and would expire on March 31, 2024. Upon respondent's compliance with the agreed-upon payments in the stipulation, the lease extension would take effect. If respondent defaulted on any payments, petitioner could seek respondent's eviction "in accordance with the terms of [the] stipulation and NY law." (Id. ¶¶ 4, 8; NYSCEF Doc No. 8, exhibit A to May 15, 2023 stipulation.) The agreement indicated the intent to "globally settle" issues between the parties, and respondent waived his overcharge claim to that date (but not his claim that his apartment had been illegally deregulated.) (NYSCEF Doc No. 7, ¶ ¶ 2, 6.)
The Allocution — Real Property Actions and Proceedings Law § 746, DRP-195
The stipulation was fully allocuted. Immediately after taking appearances on the record, the court noted that there was no lease in effect at the commencement of the proceeding. The court also dispensed with petitioner's erroneous claim that there was a statutory tenancy because of receipt of ERAP monies, as more than a year had passed since petitioner first received payment.[FN4]
The court explained to respondent that the proceeding was "defective." The court stated, "Given now your knowledge that you have that defense to the proceeding, what would you like to do? Do you want to continue with this agreement?" Respondent stated, "I think so, yes." (NYSCEF Doc No. 35 at 3-5, stipulated transcript [referred to as "tr" hereinafter].)
The court then delved into respondent's waiver of the overcharge defense and counterclaim that he had asserted in his amended answer. The court explained that this meant respondent is "not going to sue them [for overcharge]," but that respondent was "not waiving the possibility forever. If you think that there's an overcharge, you could raise that later or in some other proceeding, but not in this one. This one you are [waiving the claim]." (tr at 5.) Respondent appeared to indicate his understanding that he maintained prospective claims, to wit, he stated, "After this moment." (Id.) The transcript demonstrates that petitioner's attorney explained that respondent could claim overcharge after the date of the stipulation. The court further explicated, "[S]o it's May. So June 2023. You can't waive prospective claims[.]" Respondent asked, "I mean, if I find out." To which petitioner's attorney responded, "There's nothing I can do that stops you from saying I'm rent stabilized. [T]he agreement doesn't say that." (tr at 6.)
The court asked, "You agree with the amount that you that they're claiming?" Respondent answered "Yeah." The court then asked, "You went over the rent breakdown with my court attorney and everything's fine. (tr at 6.)[FN5]
The court then reviewed the proposed lease extension and asked to see the original lease as part of petitioner's claim for air conditioning fees as part of the arrears. The court stated that it viewed this as a possible violation of RPAPL 702, which excludes fees from the definition of "rent." Petitioner maintained that these charges were part of the rent pursuant to the terms of the original lease and that he had provided the original lease to the court attorney. The court reviewed the original unregulated lease which stated that the "monthly rent" is "2950 + A/C." (NYSCEF Doc No. 17, respondent's exhibit B, original 2017 lease.) Respondent confirmed that the provided lease was his original lease. (tr at 7.) The court then informed respondent that "there's a couple of things that give me pause here. But you agree with this agreement?" (tr at 9.) Respondent answered in the affirmative. (Id.)[FN6]
The court asked if respondent had felt any pressure from petitioner's attorney to enter into the stipulation, to which respondent answered:
Masayuki Watanabe: "Not real- I just you know the because prior to this I, I have found out that potentially they might have been actually are overcharging my rent. So that's something that I brought out when I came here last time which was in March but they [*3][transcript ends sentence].
Judge Bacdayan: Well,
Masayuki Watanabe: But it's it's very complicated. And so it's just that it's kind of hard for me to really look into what is the correct or what is not. So that's why you know then I spoke to a couple of lawyers that I know and they said, why don't you just you know take care of the payment first.
Judge Bacdayan: OK, so you did raise overcharge.
Masayuki Watanabe: Yeah, yeah I did.
Judge Bacdayan: And you rose illegal...
Masayuki Watanabe: Just because some of the tenants on my same floor got some money from them.
Judge Bacdayan: So you raised overcharge and you raised illegal deregulation, and by the terms of this agreement, you are waiving those claims. OK. I mean that means that you can't come back and say, you know what I decided I shouldn't have entered into that stipulation because my neighbor just got a big overcharge award, you know?
Masayuki Watanabe: No, they already got it. Like four or five years ago. That's why I wanted to bring that out ...
Judge Bacdayan: Okay so you know there a possibility that you would have an overcharge claim.
Masayuki Watanabe: Right, the thing is.
Judge Bacdayan: Actually, you're waiving that.
Masayuki Watanabe: You know, the thing is, I mean, every lawyer that I spoke to, it's really difficult to really look into what is the correct. So unless the lawyer really specialized for the housing, particularly, so, then this. But you know, I mean most of them basically say it's going to take a while to be able to look into it so it.
Judge Bacdayan: It would take a while or maybe not if you raised it here in housing court. A lawyer would not be a bad idea. You said you talked to one, right? You talked to a housing lawyer? Somebody who specializes and who was that?
Masayuki Watanabe: Do you mean lawyers' name? I have, so long person is I don't actually. I don't have a name. I have only assistant name. Because he's the one to actually coordinate....
Judge Bacdayan: OK, so they suggested to you that you could you waive your overcharge claim and pay the arrears. You raised a claim here. You're giving it up. This is what I'm, saying you have the opportunity.
Masayuki Watanabe: Yeah, but until this moment today, I didn't really think that this would be combined because one non payment issue, I thought non payment issue was different from the issue that I wanted to really bring out.
Judge Bacdayan: Which was?
Masayuki Watanabe: The overcharging thing, but I thought that this case was only for merely non payment issue. So that's why I didn't really think that this would be combined today.
Judge Bacdayan: Well, so this is a settlement. You have an option. You can go to trial on your defenses, right? Or you can settle the case. You can go to trial on your overcharge and unlawful deregulation charges, and you can say... I don't know, I mean, it would be up to a judge. You could win. You could lose. You have some reason to believe that you [*4]might be. You might win. I don't know what your individual facts are. Just because somebody else won in your building doesn't mean you're necessarily going to win but you have some indication that that is something that you might prevail on and you actually wrote it in your answer, and by entering into this agreement you're giving that up. So you just need to know that.
Masayuki Watanabe: And that's what he [petitioner's attorney, Scott Loffredo, Esq.] basically said to me, so that's why I thought, OK.
Judge Bacdayan: Well, he's not your lawyer. (tr at 9-10.)
Having received advice from three different lawyers, to wit, NYLAG and "a couple of lawyers that [respondent] know[s]," the court was concerned that respondent might possibly have confused petitioner's attorney with an attorney representing his interests, a speculation that petitioner's attorney vociferously disavowed. Believing that it would benefit respondent to show the proposed stipulation to one of those lawyers, the court asked respondent if he wanted to take some time to further contemplate the agreement, or take it to a lawyer to review. 
At this time, the court was not aware that on April 28, 2023, two weeks prior to signing the stipulation, respondent had called HCC and received an appointment for June 15, 2023, to meet with a paralegal to complete their intake with HCC. (NYSCEF Doc No. 14, respondent's attorney's affirmation ¶ 16.) HCC assigned the proceeding to an attorney in late June 2023. (Id. ¶ 17.) Respondent first met with an HCC attorney on July 6, 2023, three weeks before the payment deadline in the proposed stipulation expired. (NYSCEF Doc No. 15, Watanabe affidavit ¶ 17.) Respondent retained HCC on August 8, 2023. (NYSCEF Doc No. 14, respondent's attorney's affirmation ¶ 17.)[FN7]
The court notes that, with the consent of both parties, it regularly calls the legal services provider with whom a respondent has met to inquire about the status of their review of a respondent's case. Here, respondent did not provide the name or number of either of the lawyers with whom he had already discussed the proceeding, or anyone from HCC with whom he had the scheduled upcoming appointment. Had he provided any contact information for the person he spoke with at HCC, the court could have called HCC and discovered that he had the upcoming appointment.
The court made continued efforts to ensure respondent understood that he was entering into a binding contract:
Judge Bacdayan: Do you want to come back tomorrow morning? So you can think about this. Do you want to give up your claims? Look, I have. I have to follow. There's a new provision in the law which basically makes me tell you all of this. I usually did that before, but you need to be very aware of any rights you might have, any defenses you might have and that by entering into an agreement, you're giving up those defenses. This controls the proceeding now. You're basically acknowledging that up until now you have not been overcharged.
Masayuki Watanabe: Right.
Judge Bacdayan: You live there for another year. You could bring an overcharge claim, I guess, and some other judge might find that [this claim] is not waived, I don't know, but I'm just, I'm just letting you know.
Masayuki Watanabe: Yeah, but in the meantime.
Judge Bacdayan: I mean, you said you were surprised today that this would be included, right?
Masayuki Watanabe: Right. Yeah, I didn't. Yeah, before we should.
Judge Bacdayan: Right. So that's why I'm suggesting because it's very hard to get out of an agreement that maybe you want to think about it since you were surprised. Up to you. It's completely up to you.
Masayuki Watanabe: In the meantime, what's going to happen to this non payment issue?
Judge Bacdayan: It would probably go to trial on your defenses.
Masayuki Watanabe: So OK, so they OK, so these issues are basically combined as one for the trial.
Judge Bacdayan: The overcharge claim has everything to do with how much rent you owe, and this is a nonpayment of rent proceeding. This is why I'm saying maybe you want to come back tomorrow morning. Mr. Loffredo, are you in court tomorrow?
Scott Loffredo: I would ask if we could do Wednesday instead[.] . . .
Judge Bacdayan: It's not a problem.
Scott Loffredo: I did step away for an hour and I said if you want to think about it, whoever you want to call, call the attorney back.
Masayuki Watanabe: Yeah, yeah. (tr at 11.)
At another point during the allocution, the court inquired again whether respondent wanted to seek additional advice from a lawyer:
Judge Bacdayan: You want to come back on Wednesday and think about if you want to do this?
Masayuki Watanabe: Um...
Judge Bacdayan: You could take this agreement and show it to a lawyer between now and then. You've talked to lawyers. You could take this agreement. It's a potential agreement and you could show it to a lawyer.
Masayuki Watanabe: Um, that's OK, I'll, I'll, I'll agree with the statement. (tr at 12.)
Concerned that respondent might be feeling pressure from the court itself (at this point to either execute the stipulation or consult with an attorney), the court inquired:
Judge Bacdayan: Yeah? OK. Are you feeling any pressure from me to do that?
Masayuki Watanabe: Yeah, of course, because I, I'm the kind of person, for I have no I mean, basically it's really hard to, you know, defend myself in this kind of situation because I have I owe money to them so. And I feel bad about it because I lost my job and the pandemic started then. I still owe some money, so I feel definite, but, so I want to really be paid off as much as soon as possible.
Judge Bacdayan: OK. I mean, I'm just saying you're agreeing to pay a certain amount, thousands of dollars and you could be evicted if you don't.
Masayuki Watanabe: Yeah. So that's why. Right, so I'm in the process of One Shot Deal at this moment.
Judge Bacdayan: OK. It's your choice. It's really your choice.
Masayuki Watanabe: I understand. Thank you so much. . . ." (tr at 12.)
Finally, prior to distributing the stipulation, the court reiterated, "So I've explained to you that there was no lease in effect when this case was brought so it['s] technically defective, I've explained to you that you're waiving your overcharge claim and you've told me you're comfortable with that. Do you have any questions?" (tr at 13.) Respondent's only question concerned whether or not, in the event he ever vacated the apartment, a potential landlord would be able to "check with the housing court[.] (tr at 14.) The court responded that the agreement was a "public record." (Id.)
ARGUMENTS
Respondent's attorney states in her affirmation that after respondent inquired of him about the regulatory status of the apartment, "the landlord's attorney falsely represented to [respondent] that the apartment was legally deregulated and that the landlord was therefore not obligated to provide [respondent] with a renewal lease . . . ." (NYSCEF Doc No. 14, respondent's attorney's affirmation ¶ 46.) In his affidavit, respondent strongly implies that petitioner's attorney knowingly obscured the truth to him, to wit, "Mr. Loffredo told me again that [my apartment] was legally deregulated. He said . . . he wanted to settle the case. He also told me he was doing me a favor by offering me a lease through March 2024 and by removing some fees from the arrears demanded." (NYSCEF Doc No. 15, Watanabe affidavit ¶ 13.) Respondent acknowledges that he "amended" his answer after appearing in court on December 22, 2023: "I received brief advice from a lawyer with NYLAG, who pulled me aside in the hallway but was unable to represent me. The lawyer advised I bring up a potential overcharge claim." (Id. ¶ 8.) Regardless, respondent avers, "If I had understood my rights and that I had other options, I would not have signed the stipulation." (Id. ¶ 16.)[FN8]

Respondent's attorney cites to numerous appellate decisions which resulted in the vacatur of stipulations entered into by previously pro se litigants who had inadvisedly waived overcharge claims without the benefit of counsel. Respondent's attorney advances "the discretion of a court is not 'closely confined' to instances of 'collusion, mistake, accident, fraud' or 'surprise'. . . . Rather, the stipulation should be vacated if it appears to be 'unduly harsh or unjust' (internal citations omitted)." (NYSCEF Doc No. 14, respondent's attorney's affirmation ¶ 35.) To explicate the allegedly unjust nature of the stipulation, respondent's attorney points to respondent's agreement to pay more than $21,000 in alleged rent arrears in exchange for an unregulated lease extension which would expire in less than a year. Respondent's attorney advances that respondent was under "time pressure" to decide whether or not to litigate an overcharge claim.[FN9]
(Id. ¶ 46.)
Petitioner's counsel states in opposition that the transcript demonstrates the following:
"During the allocution, the Court advised the Respondent that he could have the proceeding adjourned to think about whether or not he wanted to enter into it, he could speak to counsel about his options, and he could review the terms of the agreement with his attorney (internal citations to NYSCEF Doc Nos. and transcript omitted.) After thirty (30) minutes of a literal question and answer session with the Honorable Bacdayan, J.H.C., Respondent decided he wanted to proceed with the settlement. This Stipulation could not have been more thoroughly allocuted (emphasis in original)." (NYSCEF Doc No. 32, petitioner's attorney's affirmation in opposition ¶¶ 10-11.)
In further opposition, petitioner argues,
"Aside from a self-serving claim that he was 'unaware of his options and his rights and defenses'—a claim which is clearly belied by Judge Bacdayan's allocution—Respondent has failed to put forth any basis for the Court to vacate the [stipulation]. If this [s]tipulation is subject to vacatur, under these circumstances, then every stipulation entered into in the Civil Court with a tenant-ever-is (sic) also subject to vacatur regardless of whether or not the parties already complied with its terms." (Id., ¶ 27.)
Petitioner contends that there is no legal basis to revive the nonpayment proceeding, or to vacate the stipulation. Petitioner succinctly advances, "[A]fter entering into the Stipulation, the Respondent fully performed on his obligations thereunder (emphasis in original). Petitioner fully performed on its obligations thereunder. The case is over." (Id. ¶ 12.)[FN10]
Regarding respondent's motion for leave to conduct discovery, petitioner argues there is no basis to grant leave to conduct discovery on counterclaims that have already been waived. Petitioner's attorney [*5]specifically acknowledges that respondent may always challenge the deregulation of the premises as unlawful either at the Division of Housing and Community Renewal ("DHCR"), or in a separate action, and that those claims are not waived. (Id. ¶ 5.)[FN11]
Finally, petitioner's attorney argues that nothing untoward occurred to induce respondent into signing the stipulation, and "[i]n the absence of fraud, collusion, ignorance, mistake or misrepresentation the Court should not set aside a stipulation of settlement" (Id. ¶ 21.)
In reply, respondent's attorney reiterates that petitioner is mistaken that the court must find fraud, collusion, ignorance, mistake or misrepresentation when the party seeking to vacate the stipulation was previously unrepresented. Advocating a more relaxed standard for reviewing stipulations entered into by previously pro se tenants, respondent cites to a recent Queens County Housing Court decision, 147-25 N. Assocs. LLC v Villanueva, 79 Misc 3d 1212 (A), 2023 NY Slip Op 50602 (U) (Civ Ct, Queens County 2023), in which the court observed, "In housing court, where proceedings are frequently settled on the first or second appearance without the benefit of counsel, courts regularly vacate pro se stipulations that involve the needless loss of a rent-regulated tenancy, or the waiver of substantive defenses, such as a colorable claim of rent overcharge."[FN12]
(Villanueva, 2023 NY Slip Op 50602 [U], *2.) Respondent's attorney contends that respondent "clearly stated on the record that he felt pressured" into signing the stipulation. (NYSCEF Doc No. 36, respondent's attorney's reply affirmation ¶ 3.) Respondent's attorney reiterates respondent's argument that "[t]he [s]tipulation was unjust and one-sided in that it took advantage of [respondent's] lack of knowledge about his rights. Moreover, it sought to evade rent regulation laws and deprive [respondent] of rights guaranteed under rent stabilization. Thus, the stipulation was not only unjust, but contrary to public policy." (Id.)[FN13]

DISCUSSION
It is well-settled that stipulations of settlement are favored by the courts and are not lightly cast aside. (See Hallock v State of New York, 64 NY2d 224 [1984]). Adherence to this rule not only allows for "efficient dispute resolution," but maintains the "integrity of the litigation process." (Id. at 230; Campbell v Bussing, 274 AD 893 [2d Dept 1948] [holding that "a stipulation will not be destroyed without a showing of good cause therefor, such as fraud, [*6]collusion, mistake, accident, or some other ground of the same nature . . . ."]) However, courts maintain the discretionary power to relieve a party from an agreement "if it appears that the stipulation was entered into inadvisedly" or will "take the case out of the due and ordinary course of proceeding in the action, and in so doing may work to [its] prejudice." (In re Frutiger's Estate, 29 NY2d 143, 150 [1971] [internal quotation marks and citation omitted].) "The discretion of a court is not that closely confined [to the grounds commonly cited]" and an unjust stipulation should be vacated when the "parties may be returned to their former status." (Solack Estates, Inc. v Goodman, 102 Misc 2d 504, 506 [App. Term, 1st Dept 1979] [internal citations omitted], affd 78 AD2d 512 [1st Dept 1980].) In 144 Woodruff Corp. v Lacrete, 154 Misc 2d 301, 305 [Civ Ct, Kings County 1992]), the court stated that while lack of representation is not sufficient in and of itself to vacate a stipulation, "a party's lack of representation at the time of entry into the stipulation is a significant factor to be considered in determining whether good cause exists to vacate the stipulation." (Lacrete, 154 Misc 2d at 302.)
The court has previously interpreted these often-cited seminal cases — all of which were decided between 1971 and 1992, almost thirty years prior to the full implementation of the UAC initiative in June 2021 — in the context of the "new reality" of Housing Court, where income-eligible tenants should receive full representation or advice from a free legal services provider.[FN14]
,[FN15]

The Universal Access to Counsel Law
UAC is often cited to judges by unrepresented litigants for the proposition that they are entitled to have the court appoint them a free lawyer. This, however, is a misunderstanding. The City of New York contracts with legal services organizations to provide these services for eligible tenants; the court is not obligated to assign counsel. (Cf. Gideon v Wainwright, 372 US 355 [1963] [finding that the Sixth Amendment right to the assistance of counsel extends to state criminal proceedings].)[FN16]
The website for the Department of Social Services ("DSS") advertises that "[t]enants facing eviction in Housing Court . . . have access to free legal representation or [*7]advice provided by legal services organizations from across the five boroughs. . . . [L]egal service providers are connecting with tenants at their first Housing Court conferences."[FN17]
While this is for the most part true, having access to connect with a free legal services lawyer is worlds apart from the invaluable commodity of the "full legal representation"[FN18]
which is contemplated by UAC. However, as discussed below, full representation or brief legal services for every eligible tenant comes with a hefty price tag and myriad challenges.[FN19]

Unfortunately, the initiative has emerged as problematic and unrealistically aspirational, given the many challenges that were not necessarily possible to predict. UAC is plagued with 1) underfunding woes and delayed receipt of the funds that are available; 2) large court calendars replete with eligible tenants who do not receive representation (and sometimes — due to the volume of tenants who must be seen on any given day — not even advice); and 3) the high attrition rate of overworked lawyers from organizations that are overwhelmed by the demand. According to an 2022 headline in The City, "Less Than 10% of Tenants Facing Eviction Actually Got a Lawyer [in September 2022], Undermining 'Right to Counsel' Law."[FN20]

Reporting on a March 27, 2023 Office of Civil Justice ("OCJ") oversight hearing, the publication City Limits wrote that legal services providers proposed a $351-million dollar increase to the currently budgeted $110 million in order to properly fund their contracts and hire more attorneys.[FN21]
However, according to an August 2023 press release issued jointly by NYLAG, the Legal Aid Society ("LAS"), and Legal Services NYC ("LSNYC"), "Even if fully staffed, providers are only contracted to represent roughly a third of all tenants facing eviction — approximately 32,000 of the 120,000 eviction cases expected to be filed this year."[FN22]
Even with [*8]increased funding for additional lawyers, NYLAG forecasts difficulty in attracting lawyers to fill the need. "Currently, [LAS] has 35 RTC [Right to Counsel] attorney vacancies and an attrition rate of 30 percent due to insufficient compensation and extremely high caseloads, coupled with rising rents, student loan debt and New York's exorbitant cost of living. LSNYC has 10 RTC attorney vacancies and, at last count, an attrition rate of 39 percent. NYLAG has five RTC attorney vacancies with an attrition rate of 22 percent."[FN23]
An LAS staff attorney is quoted by a reporter from The City as saying: "We need sustainable wages and above all sustainable case[load] caps. . . . If we aren't able to keep the experienced attorneys we already have, we're not going to be able to build up the program to sustain it."[FN24]
 The attorney describes their current experience as "a nightmare."[FN25]

The situation can only worsen. As reported by the Cornell ILR Eviction Filings Dashboard, eviction filings and executed evictions are reaching pre-pandemic levels.[FN26]

Who is responsible? Are there viable solutions?
According to Rosalind Black, the Citywide Director of Housing at LSNYC, "Without the necessary funding, this once robust, highly-effective eviction defense program will continue to falter, driving away already overburdened housing attorneys and leaving tenants and their families to fend for themselves in court, ultimately adding to an already dire housing crisis."[FN27]
Austen Refuerzo, Managing Attorney of the Civil Defense Practice at Neighborhood Defender Services of Harlem, has remarked, "Budgets reflect priorities. City Council has recognized the need for counsel in eviction proceedings, but they must now provide funding to make it a reality."[FN28]
Referring to a letter to Mayor Adams signed by 26 of 51 New York City Council members, the New York Daily News reported that one councilmember, a former NYLAG attorney, observed, "This is really a call to the administration to cough up and pony up money in order to make sure that the right to counsel that was once promised continues to operate as intended."[FN29]
The councilmember described the additional funding requested by the City Council [*9]as a "fraction of what's needed."[FN30]
,[FN31]

A City Limits article reported that DSS has previously suggested a "slow down [of calendared] cases to ensure tenants don't face judges without an attorney in the near term . . . ."[FN32]
Pointing to an email statement without attribution, City Limits reported that DSS is "supportive of any efforts which would help slow down the calendaring of cases by the courts" until additional funding is approved.[FN33]
The Right to Counsel NYC Coalition points the finger directly at the court system, opining on its Frequently Asked Questions page, "The reason tenants aren't getting attorneys today is because the courts are refusing to use their power to slow down cases until everyone has an attorney. The courts refuse to match the flow of cases with the capacity of the RTC legal services providers (bold and italics in original)."[FN34]
 In turn, the Office of Court Administration spokesperson Lucian Chalfen said to a reporter from The City in October 2022, that since March of 2022, "there have been more than 7,000 cases declined by the Right to Counsel providers because of their inability to fulfill their contractual obligations,"[FN35]
 a statement which begs the questions posed by the challenges set forth above.
Unfortunately, this is now the "new reality" of Housing Court, a far cry from what was once hailed as a "groundbreaking, transformative step forward."[FN36]
Upon the passage of the law in 2017, Andrew Scherer, Policy Director at the Impact Center for Public Interest Law at New York Law School, praised UAC as a "victory for human and civil rights; for equality and justice; for the right to be treated with dignity and respect in court; and for the right to safety and security in one's home and community."[FN37]
Six years later, all stakeholders have universally found themselves in a seemingly intractable state of affairs for which few solutions have been advanced and over which this court employee has no control, to wit, 1) greatly increased funding; 2) increased staffing of legal services organizations who are sadly experiencing unprecedented attrition; and 3) smaller court calendars.
At oral argument, the court inquired of respondent's attorney what, precisely, NYLAG or [*10]the court "could have done better." Respondent's attorney replied that neither the advice from the NYLAG attorney nor a 30-minute allocution from the judge was sufficient to inform respondent of "how" to litigate an overcharge claim for which a lawyer would be necessary. The response is echoed in respondent's attorney's reply affirmation: "[Respondent] did not have sufficient understanding of the issue to pursue it himself without legal representation." (NYSCEF Doc No. 36, respondent's attorney's reply affirmation ¶ 8.)
Of course, it is beyond cavil that full representation by an attorney makes a significant difference in the outcome of an eviction proceeding. Indeed, a lawyer for every eligible tenant in Housing Court is the objective of UAC. But the court can neither assign counsel nor assume the role as an advocate if a tenant does not receive representation pursuant to the strictures of the UAC law. It is a shaky bridge between a thorough allocution of a stipulation, and advocacy. This is an ethical conundrum for judges given that the court "must avoid any appearance of bias or impropriety," 22 NYCRR 100.2, but, at the same time, thoroughly allocute a stipulation as required by law. (RPAPL 746.) A judge may inform litigants of their "legal options, as long as they do not suggest or recommend any specific action (emphasis added)." (Advisory Comm on Jud Ethics Op 22-147 [2022] [internal citation omitted].) UAC, which is ideally supposed to fill in this hole, is clearly struggling to stay above water, evidenced by the fact that the number of tenants who do not receive "access to full legal representation no later than their first scheduled appearance . . . or as soon thereafter as is practicable," far outweighs the number that do.[FN38]
Nevertheless, it is neither possible nor ethical for a judge to compensate for the lack of legal representation during an allocution.
Against this backdrop, the court also has a duty to manage its calendar. Just as a judge cannot be responsible for compensating for the lack of representation, neither can a judge be charged with adjourning cases indefinitely until counsel is secured. "[A] judge is continuously faced with an excess of work and a shortage of time. Efficiency and conserving time, especially trial time, are critical. . . . In an era of case management, a judge is also obliged to keep a close watch on the age of the inventory. Some delay is inevitable, but it must be kept to a minimum. If it is not, the judge is held accountable to the public, to the bar and to court administrators[.]"[FN39]

Here, after receiving brief services from a UAC provider, respondent amended his answer to include defenses and counterclaims related to unlawful overcharge and illegal deregulation. Ultimately, the provider of the day could not provide respondent with full representation despite the law and his apparent eligibility for same. Five months after answering the proceeding with the benefit of advice from a UAC attorney, respondent entered into an agreement that was allocuted by the court in compliance with the relevant directives and statute. Respondent, more persistent than most, continued on his own to seek free legal representation. He was given an appointment by HCC in April 2023, was assigned to a lawyer in late June 2023, and first met with the lawyer three weeks prior to full satisfaction of the stipulation by both parties and receiving the negotiated benefit of the bargain, albeit not the benefit he now prefers. HCC made the strategic decision not to intervene sooner by advising respondent to alert the court to the change in circumstances via an order to show cause, an uncomplicated procedure for [*11]an unrepresented litigant. Respondent knowingly waived his overcharge claim. He was aware that his neighbors had received overcharge awards. He was advised by an attorney to assert it in his answer. He was advised by the court that he could have the proceeding dismissed for lack of a lease, and that it appeared to the court that he had a colorable claim of overcharge which he was waiving. Respondent was asked numerous times if he wanted to speak to any of the three lawyers with whom he had consulted. Prior to so-ordering the stipulation, the court reiterated to respondent that the proceeding was defective and dismissible, and that he was waiving his overcharge claim.
Of course, hindsight is 20/20. Upon learning that there was no lease in effect at commencement, perhaps the court should have dismissed the proceeding for lack of a lease on its own motion. (W. 152nd Assoc., L.P. v Gassama, 65 Misc 3d 155 [A], 2019 NY Slip Op 51926 [U] [App Term, 1st Dept 2019]; 7 E. 14, LLC v Libson, 79 Misc 3d 1230 [A], 2023 NY Slip Op 50752 [U] [Civ Ct, New York County 2023], affd 81 Misc 3d 130 [A], 2023 NY Slip Op 51261 [U] [App Term, 1st 2023]; Fairfield Beach 9th, LLC v Shepard-Neely, 77 Misc 3d 146 [A], 2022 NY Slip Op 51351 [U] [App Term, 2nd Dept 2022].) However, having informed respondent of this defense, respondent chose to go forward, and so the court allocuted the stipulation. Had there been a lease, the court would have sent the case to trial. But the practice of the court is not to send cases out to trial when there is an obvious flaw in the petitioner's prima facie case. However, defenses can be waived so long as they do not implicate the court's subject matter jurisdiction. (433 W Assocs. v Murdock, 276 AD2d 360, 360-361 [1st Dept 2000] [upholding waiver of "essential elements" of a landlord's prima facie case which provided a complete defense, because the court's subject matter jurisdiction was not implicated].)
The court notes that numerous respondents, even represented tenants, choose to go forward with a settlement despite, for example, having already satisfied the arrears claimed in the petition prior to the first or second court appearance, and being informed by the court that the landlord case is moot. (RPAPL 731 [4].) An educated supposition is that this occurs because there exist underlying issues with the agency that administers a housing subsidy that need to be resolved; they fear eviction and entering or re-entering the shelter system; their only hope is to apply for a "one-shot deal" to prevent dislocation and DSS erroneously requires a court stipulation and a landlord's rent ledger (often provided for the first time in court) before it will begin processing an application; they fear too many court appearances may lead to the loss of their job; and news headlines inform them (not incorrectly) that it is highly unlikely they will receive full representation from a free attorney. As an unrepresented litigant in Housing Court, pressure and anxiety are baked into the entire experience.
The last stop is the judge; and judges do the best they can to ensure fairness with 60-80 — often more — cases calendared on any given day and little more than the pleadings, a stipulation, and a breakdown before them.[FN40]
In that vein, the court notes that this proceeding may never have been commenced had petitioner been required to attach documents supporting its cause of action to the petition or an affidavit of merit. Towards this end, the New York State Assembly is considering a bill that would require petitioners in eviction proceedings to attach documents [*12]supporting their cause of action either to the petition or to a certificate of merit. (2023 NY Assembly Bill A2883.) In this case, those documents would have included, at minimum, a current lease, and a DHCR rent regulation history.
CONCLUSION
Here, under the facts and circumstances of this proceeding and in the context of a faltering UAC program — as well as the numerous moving parts and competing interests in Housing Court, which must be balanced each day in every case on the docket — vacatur of the stipulation is not warranted. While lack of representation is a significant factor to consider when tasked with a motion to vacate a stipulation, here, respondent's failure to retain counsel through UAC until seven months after the initial court appearance is not significant enough an aberration from the normal course to warrant vacatur of a stipulation.[FN41]
The proceeding followed the "ordinary course" in today's Housing Court: the proceeding was delayed by the first adjournment of almost three months to connect with counsel, a controversial but reasonable delay considering all of the extenuating circumstances. The proceeding was further delayed by a second adjournment of two months due to the court's requirement that petitioners appear in court with proper rent breakdowns to ensure the reliability of claimed arrears. In this court's opinion, the stipulation, with which the parties fully complied, should not be disturbed at this juncture. Respondent has not forever waived an overcharge claim, nor did respondent forfeit his tenancy, or waive his claim that he should be afforded the protections of the Rent Stabilization Law as a regulated tenant. The agreement does not shock this court's conscience under the facts and circumstances set forth above. Respectfully, should respondent appeal, the court would welcome guidance from the Appellate Term.
Accordingly, it is
ORDERED that respondent's motion to vacate the stipulation and interpose an amended answer asserting, inter alia, lack of a lease and unlawful overcharge, is DENIED. As such, the court need not address respondent's remaining arguments.
Petitioner shall serve a notice of entry upon respondent within 5 business days.
This is the decision and order of the court.
DATED: February 21, 2024
New York, NY
Karen May Bacdayan, JHC

Footnotes

Footnote 1:This answer was not filed on NYSCEF due to a clerk's error but was provided to both parties' attorneys on February 14, 2024, when the instant motion was orally argued before the court. The answer is now filed on NYSCEF as NYSCEF Doc No. 37, self-represented litigant answer, dated December 15, 2022.

Footnote 2:Respondent states that when he first moved into the subject apartment, it "appeared to have been renovated within the past few years." NYSCEF Doc No. 15, Watanabe affidavit ¶ 3.

Footnote 3:Pursuant to the Part F rules, "In all nonpayment cases, petitioners must provide a breakdown with a zero balance. Late and legal fees must be removed from any stipulation. If no zero-balance breakdown is provided, the court will not so order a settlement, and the case will be adjourned to the court's next available date." See Part Rules, available at https://www.nycourts.gov/COURTS/nyc/housing/Judge/partrules/KBacdaya.pdf. 

Footnote 4:Compare JSB Props. LLC v Yershov, 77 Misc 3d 235, 242 (Civ Ct, New York County 2022) ("[O]ccupant's ERAP application constitutes an effort to bind a landlord to treat the applicant as a tenant for one year, an act consistent with an intention to continue a landlord-tenant relationship."), with 417 E. Realty LLC v Kejriwal, 80 Misc 3d 583 (Civ Ct, New York County 2023).

Footnote 5:The court notes that every stipulation with an unrepresented litigant in this judge's courtroom is reviewed by the court attorney, always with the respondent present, and usually with petitioner if petitioner remains in the courtroom. The court attorney adheres to a directive issued on January 23, 2012, by then Deputy Chief Administrative Judge of the New York City Housing Court and Director of the New York State Courts Access to Justice Program. Civ Ct of City of NY, Directive & Pro 195 (eff Jan. 23, 2012) (DRP-195), available at https://nycourts.gov/courts/nyc/SSI/directives/DRP/DRP195.pdf. The court attorney is also aware of Civ Ct of City of NY, Advisory Notice 1 (eff Apr 6, 2007) (AN 1), available at https://nycourts.gov/courts/nyc/SSI/directives/AN/AN1.pdf. These notices require a thorough review of the stipulation by the court attorney, which does not substitute for a thorough allocution by the presiding judge. These notices were provided to this judge's court attorney upon his hire. The court has personally witnessed attorneys' consternation with the court attorney's lengthy review of stipulations prior to their being presented to the judge.

Footnote 6:Respondent does not raise the issue of air conditioner fees in his motion.

Footnote 7:The instant motion was filed on August 31, 2023, along with a notice of appearance by HCC one month after both parties had fully complied with the terms of the May 15, 2023 stipulation.

Footnote 8:Given respondent's consultation with NYLAG, and his knowledge that his neighbors had received an overcharge award, respondent could not have justifiably relied on petitioner's attorney's statement that the apartment was legally deregulated.

Footnote 9:This is an unfortunate misinterpretation of what transpired during the 30-minute allocution on May 15, 2023. Respondent does not deny that petitioner's attorney advised him to "call the attorney back" and then stepped away for an hour to allow him to do same. tr at 11-12. Moreover, in an attempt to assuage respondent's concern that it could "take a while" to prosecute an overcharge claim, the court advised respondent that "[i]t would take a while or maybe not if you raised it here in housing court. A lawyer would not be a bad idea." tr at 10. Out of an abundance of caution, after advising respondent that petitioner's attorney was "not [his] lawyer," the court suggested more than once that respondent take a day or two to speak with one of the attorneys he had previously contacted, not knowing that respondent had already obtained an appointment with HCC. Inexplicably, having been assigned an HCC attorney before the parties fully complied with the stipulation, HCC made the strategic decision not to advise respondent to file an order to show cause on his own to alert the court to changed circumstances. The court takes no position on whether it would ultimately have vacated the stipulation had HCC timely acted, however, this court can say with absolute certainty that such an order to show cause would have been signed by this judge for a date returnable approximately two weeks later, and one week prior to full compliance with the stipulation by both parties to the agreement.

Footnote 10:Indeed, respondent raises "payment" as his first affirmative defense in his proposed amended answer drafted by HCC, presumably, but not specifically, referencing RPAPL 749 (3), which states in relevant part, "the court shall vacate a warrant (but not a judgment) upon tender or deposit with the court of the full rent due at any time prior to its execution."

Footnote 11:During the allocution, Petitioner's attorney acknowledged that the waiver of any potential overcharge claim is only through the date of the stipulation (May 15, 2023), and subsequently accruing overcharges, if any, can be claimed. tr at 5.

Footnote 12:Incidentally, the Villanueva court ultimately did not vacate the stipulations at issue, one of which was executed by an unrepresented litigant.

Footnote 13:While admittedly distinguishable on the facts, in 159 MP Corp. v Redbridge Bedford, LLC, 33 NY3d 353 (2019), the Court of Appeals noted that "because freedom of contract is itself a strong public policy interest in New York, we may void an agreement only after 'balancing' the public interests favoring invalidation of a term chosen by the parties against those served by enforcement of the clause and concluding that the interests favoring invalidation are stronger (internal citation omitted)." 159 MP Corp., 33 NY3d at 360. The Court further noted that "that a public interest is present does not erect an inviolable shield to waiver (internal citation and quotation marks omitted)." Id. at 361.

Footnote 14:Administrative Code of the City of NY § 26-1301 et seq.

Footnote 15:In 2247 Webster Ave. HDFC v Galarce , 62 Misc 3d 1036 (Civ Ct, Bronx County 2018), this court vacated a stipulation entered into by an unrepresented litigant because her case was mistakenly assigned to a courtroom where she did not have the opportunity to obtain counsel, thus taking the proceeding out of the ordinary course of what is ideally supposed to happen in Housing Court pursuant to the UAC program, i.e., "the new reality."

Footnote 16:The New York City Department of Social Services' Office of Civil Justice coordinator is broadly responsible for establishing and maintaining the new program, including designating organizations to provide services and ensuring "all income-eligible individuals receive access to full legal representation no later than their first scheduled appearance in a covered proceeding in housing court, or as soon thereafter as is practicable (emphasis added)." Administrative Code of the City of NY § 26-1302 (a) (2).

Footnote 17:See New York City Human Resources Administration, Department of Social Services, Legal Services for Tenants Facing Eviction - NYC's Right-to-Counsel Law, available at https://www.nyc.gov/site/hra/help/legal-services-for-tenants.page (last accessed Feb. 20, 2024).

Footnote 18:"The term 'full legal representation' means ongoing legal representation provided by a designated organization to an income-eligible individual and all legal advice, advocacy, and assistance associated with such representation. Full legal representation includes, but is not limited to, the filing of a notice of appearance on behalf of the income-eligible individual in a covered proceeding." Administrative Code of the City of NY § 26-1301.

Footnote 19:Eligible tenants are those whose income is 200 percent or less of the federal poverty level guidelines. For a family of one, that comes to an annual salary of $29,160. New York State Office of Temporary and Disability Assistance, General Information System (GIS) Message, available at https://otda.ny.gov/policy/gis/2023/23DC016.pdf (last accessed Feb. 20, 2024).

Footnote 20:Sam Rabiya, Less Than 10% of Tenants Facing Eviction Actually Got a Lawyer Last Month, Undermining 'Right to Counsel' Law, The City, Oct. 27, 2022, available at https://www.thecity.nyc/2022/10/27/23425792/right-to-counsel-housing-court-tenant-lawyers/ (last visited Feb. 20, 2024.)

Footnote 21:Emma Whitford, What Would it Take to Fully Fund Right to Counsel for NYC Tenants?, City Limits, Apr. 10, 2023, available at https://citylimits.org/2023/04/10/what-would-it-take-to-fully-fund-right-to-counsel-for-nyc-tenants/ (last accessed Feb. 20, 2024).

Footnote 22:New York Legal Assistance Group, Lack of Funding Continues to Jeopardize Right to Counsel Providers' Ability to Represent Low-Income Tenants in NYC Housing Court, Apr. 10, 2023, available at https://nylag.org/lack-of-funding-continues-to-jeopardize-right-to-counsel-providers-ability-to-represent-low-income-tenants-in-nyc-housing-court/ (last accessed Feb. 20, 2024).

Footnote 23:Id.

Footnote 24:See n 21, supra.

Footnote 25:Id.

Footnote 26:Cornell ILR Eviction Filings Dashboard, available at https://blogs.cornell.edu/nysevictions/city-and-district-court-filings-by-zip-code/ (last accessed Feb. 20, 2024).

Footnote 27:See n 22, supra.

Footnote 28:Id.

Footnote 29:Chris Sommerfeldt, New York City urges Mayor Adams to increase funding for legal aid providers, NY Daily News, June 19, 2023, updated Sept. 6, 2023, available at https://www.nydailynews.com/2023/06/19/nyc-council-urges-mayor-adams-to-increase-funding-for-legal-aid-providers/ (last accessed Feb. 20, 2024).

Footnote 30:Id.

Footnote 31:While no one can doubt the obvious need or good intentions of those in favor of expanding right to counsel to include individuals and families at 400 percent of the federal poverty level (double the eligibility level now), given the hardships that legal services organizations are already experiencing, it is difficult to conceive that doing so would increase the amount of fully represented tenants in Housing Court. See New York City Bar, Committee Report: Expanding Right to Counsel for Tenants in New York City Housing Court, reissued Mar. 2020, available at https://www.nycbar.org/reports/expanding-right-to-counsel-for-tenants-in-new-york-city-housing-court/ (last accessed Feb. 20, 2024) ("Despite the success of RTC, the astronomical cost of living in New York City reveals the insufficiency of the current financial eligibility levels for representation.")

Footnote 32:See n 21, supra.

Footnote 33:Id.

Footnote 34:Right to Counsel NYS Coalition, FAQ on Defend RTC, available at https://www.righttocounselnyc.org/faq_on_defend_rtc (last accessed Feb. 20, 2024.)

Footnote 35:See n 20, supra.

Footnote 36:The Official Website of the City of New York, Mayor de Blasio Signs Legislation to Provide Low-Income New Yorkers with Access to Counsel for Wrongful Evictions, Aug. 11, 2017, available at https://www.nyc.gov/office-of-the-mayor/news/547-17/mayor-de-blasio-signs-legislation-provide-low-income-new-yorkers-access-counsel-for#/0 (last accessed Feb. 20, 2024).

Footnote 37:Id.

Footnote 38:Administrative Code of the City of NY § 26-1302 (a) (2).

Footnote 39:Stephen G. Crane & Robert C. Meade, Jr., Adjournments in State Civil Practice: Courts Seek Careful Balance Between Fairness and Genuine Needs, 72 NY St BJ 36 (May 2020).

Footnote 40:"We just do not know the answers or implications for an exponential number of varied fact situations, so we should do what courts are in the business of doing—deciding cases as best they fallibly can." (Braschi v Stahl Assocs. Co., 74 NY2d 201, 215—216, [1989, Bellacosa, J., concurring].)

Footnote 41:This proceeding is also distinguishable from 2247 Webster Ave. HDFC v Galarce , 62 Misc 3d 1036 (Civ Ct, Bronx County 2018), where the respondent never received the opportunity to connect with counsel to which she was entitled.